The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this honorable court may go on air, give their attendance, and they shall be heard. God save the United States of America and this honorable court. You may be seated. Court is in session. Today's cases will be called as previously announced, and the times will be as allotted to counsel. The first case today is number 191305, 191315, and 191312, and other case numbers. Attorney, United States v. Vazquez-Rijos, Vazquez-Rijos, and Ferrara-Sosa. At this time, would Attorney Sanchez please introduce himself on the record to begin? Before you begin, let me just make sure. Judge Lopez is joining us remotely, as you know. Judge Lopez, are you able to hear everything? Yes, I can. Thank you very much. Okay, and Judge Lopez, I see you're able to see the courtroom as well. Yes, I can. Okay, great. Okay, but we cannot see you, but that's okay. Okay, with that, please begin. Good morning, Your Honor. Carlos Sanchez, and I represent Marcia Vazquez. Your Honor, with the Court's permission, I would like to reserve four minutes for rebuttal. You can have three. Your Honors, in Estes v. Texas, the U.S. Supreme Court said that a fair trial is the most fundamental of all freedoms. If you look at the record as a whole in this case, Marcia Vazquez did not have a fair trial. First, there was the intentional prosecutorial misconduct in hiding the records of the government's cooperator. And that cooperator was the only witness that the government presented to corroborate the Section 1958. Could you flesh that out a little more? Your Honor, I thought that the government made available those records, or at least let your client know that those records were available, the records from his incarceration, and that they never subpoenaed them, unlike one of the other defendants who did secure the records. Sure. This is what happened. The government gave the records to Audia, but not to Marcia. But didn't they make them available to your client? What they did was they fought against giving the records to Marcia's lawyers, and they never gave the records to Marcia's lawyers. I think it's helpful to ask, if you can just isolate on this question. At some point, my understanding is the district court agreed that the records had to be made available, correct? Correct. Then there was a subpoena for those records, and the subpoena was complied with as to Audia, correct? No, Your Honor. They were handed over to Audia voluntarily. Was there a subpoena from Audia? There may have been. There may have been a subpoena to Audia, but they didn't fight the subpoena that Audia sent, whereas they fought Marcia's subpoena, and they never gave the records to Marcia. Even when there was a court order to provide those records, the records were never provided. Excuse me. Did you file a motion to compel? Your Honor, I believe that the trial lawyers took all the necessary steps. Maybe they could have done more. Please, it's going to help us understand your argument better if you just answer the specific question. Was a motion to compel filed? No. Okay. So what was done by your – well, I don't know if you were the attorney at trial, but whoever the attorney at trial was for your client. What was done in the wake of the district court's ruling that the records should be made available to the defendants? Your Honor, I believe emails were sent to the BOP by the trial lawyer. I wasn't the trial lawyer. I was appointed appellate counsel for Ms. Vasquez. But, Your Honor, maybe they could have done more. I'm not interested. I want to just know what was done. They sent emails to – To who? To the BOP attorney requesting the records, and the records were never provided. And then they kind of went into a trial mode, and they didn't do anything else. And was the district court ever apprised of the fact that the records had not been provided? The district court was not apprised by Marcia's trial lawyers that the records were not provided because what they explained to me is that by the time they – But can you – so just for purposes of the Rule 33 motion, I guess this is why this lot of inquiry matters to me. It seems hard to see, and I guess I'd just like your view of it, how the Rule 33 standard can be met when those documents were ordered to be made available and then no steps were taken to apprise the district court that they were not made available if that's the position. Because under the Rule 33 standard, it seems that there were things then that could have been done pre-verdict that might have resulted in the records that are claimed not to have been provided to have been provided. More could have been done by the trial lawyers, Your Honor. That is true. But I think the key point here is when you weigh perhaps that more could have been done on that side, you have to look at what the government was doing against Marcia in not providing those records because there were orders to provide the records, and they still did not provide them. So the lawyers should have followed up after that order, but the government still did not comply with the order by the court. Let me ask you, how does that relate to the Rule 33 standard? I understand the argument that you're making in terms of a Brady or Jiglio claim, but at the Rule 33 stage, what we're interested in is given that the motion is being filed post-verdict, is it truly new evidence at that point? Is it true that there was no opportunity to get it at that point? And what's concerning to me is, well, if in the trial process itself something could have been done to obtain those records because there had been an order that they had to be made available and the district court wasn't apprised that they then weren't made available, that seems to me to make the Rule 33 argument difficult, even if there was error by the government in not turning them over earlier in the course of the trial. Do you follow what I'm asking? I do follow, Your Honor, but I do have to question whether it was error or whether it was actually intentionally bad faith in not providing those records because you need to ask the court, with all due respect, needs to ask itself, why were the records provided to Aurea but not to Marcia? And I think the answer to that is because the government knew that Marcia had a stronger defense and they wanted to weaken her defense against the government charges. There's nothing on the record that answers that question. All we know is that the government provided it to one, didn't provide it to others, but there was a court order in place ordering that it be provided to everybody. We don't know why the government did what it did. Well, Your Honor, that's a question that we've been asking and the government hasn't provided an answer because they gave it to Aurea but they didn't give it to Marcia. Your Honor, I think the next conduct by the government in refusing to produce the Giglio materials shows also this pattern of acting with prosecutorial misconduct against Marcia's case because, again, the cooperator was the main witness. These are arguments that you're making in connection with the Rule 33 motion, correct? In connection with the lack of a fair trial, yes, Your Honor, both. I don't understand what the argument is about the lack of a fair – is that a separate argument from the Rule 33 motion? Yes, Your Honor, because we're saying that because of judicial bias, because of the serious spillover, and because of – the record as a whole shows that Marcia did not have a fair trial. Are you making some kind of due process argument? Well, Your Honor, what I'm making is a fair trial argument based on the judicial bias, too, that was shown by the district court, which is something that rises to the level where the district court, with all due respect to the judge, became an advocate for the prosecution, not only by interrupting the cross-examination of all of the defendants with an incredible judge-made objection, which she called repeat performance, but also by helping the prosecutor with competency arguments. On those two, can you – there was two – if I'm understanding the brief correctly, there's two particular interventions by the district judge that are not the don't-repeat-yourself variety, but are, you say, affirmative aid to the prosecution's cases. I understand that one of them relates to a question that the judge asked about money and what money would be available. And then the second is a comment about elated being elated. Am I right that those are the two instances where you're identifying affirmative assistance to the government through the interventions? No, Your Honor, there were actually more, and I think we signaled them in our motion. For example, at the Appendix 1644, when Marcia's conducting a line of cross-examination, questioning why the cooperator is going to get a benefit from cooperating, the judge interrupts and says, that does not apply if the court sentences you to life, which is something that maybe the prosecutor would have advocated. But it's kind of unusual for the judge to say that, and that's helping the prosecution. Going back to the two that I was asking about, though, could you just walk me through those, the comment about the money from the district court and the comment about being elated from the district court? Well, the comment about the money was particularly damaging to Marcia's case because what the government did, and I'll go quickly with this, what the government did with Marcia is she was like the meat in the sandwich. The government presented seven days of circumstantial evidence against Audia, and then they brought Pavone in, and then they presented seven days of evidence against Audia again. And what the judge did in that instance when Cattrall was on the stand, the judge interrupted him and said, and he's questioning Cattrall like the prosecutor, asking him, well, if he dies, she gets money. And that's what the exact statement is. If she dies, he gets the money, or does he say there's no money unless she dies? Perhaps it was that, but the signal to the jury is... Which was it? Do you remember? Your Honor, I don't remember. Because the second one seems not accurate. It's just not true that there would be no money unless he dies. Because there would be... So what did the judge say? What is the objection? What did the judge say? The objection is that the signal to the jury... No, no, no. What did the judge say? Your Honor, the judge specifically, if I recall correctly, interrupted Cattrall and asked Cattrall, so she has money if he dies, and Cattrall said yes. And that was particularly prejudicial, again, because that's evidence that doesn't even come in with Marcia. Marcia is in a separate trial. Coming back to the Giglio violation, Your Honor. Can you do the elated comment? Just walk me through that one. In your brief, you talk about an intervention by the district court with respect to some comment, and where he says you must have been elated when you got... Your Honor, in this case, the police of Puerto Rico accused an innocent man who was convicted, and his brother was one of the witnesses for the government. And at the end of his testimony, when he's about to leave the stand, the judge interrupts and says, because he had received a letter that Pavon wrote in which he's incriminating himself, saying that he wants money, and he took that letter to the FBI, and he said, you must have been elated after receiving that letter. And what's the concern about that comment? So, again, it creates an improper atmosphere from the presiding officer. Because it bolsters Pavon's credibility, is the idea? It suggests that it bolsters the government's case, that what the letter was saying was the truth. And so was there an objection, or was there a motion for mistrial at that point? Yes. Okay. I'm from Marciano. Furthermore, Your Honor, the Giglio violation is particularly serious here, and the government tries to defend it by saying, well, those transcripts were provided to the defense. But if you look at the record, the transcripts were not provided to the defense until seven days later when they were sent on 9-24-2018. So they were not available to the defense. You're referring to the transcript of the ex parte between the prosecutor and the court? Correct, Your Honor. Was there any explanation from the court as to why there was that delay in getting them to you? No, the court basically adopted the government's argument that, and I think this goes to show the judicial bias here. The district court should have told the government at that point, you need to disclose this to the defense. This is Giglio information because this is the main accuser of Marciano, and you need to give this to the defense. But the judge was part of it and did not maintain their ex parte and never disclosed it. Can I ask you, I understand if a witness recanted, that would have to be turned over. Is it the case that if a cooperator says, you know what, I don't think I'm going to testify, that that has to be turned over? And what supports that? The reason I'm concerned is I'm just imagining, suppose in negotiations with a potential cooperating witness, the witness says, no, I'm not going to testify, I'm not going to testify, and then decides to testify. Does all of the earlier statements in which the cooperator said, I wasn't going to testify, have to be disclosed to defense? I believe they have to be disclosed to the defense, and I believe there is even a guideline from the Justice Department requiring that. And certainly that is Giglio material that can be used by the defense in impeaching this witness, and this witness was key to convicting Marciano because he was the only one who corroborated the government's case for a conspiracy case, no other witness did, not even Osterman, who picks up Pabon, or the letter carrier. None of them offered any corroborating evidence to sustain the elements of the Section 1958 conspiracy. Counsel, when the prosecutor made the court aware that Pabon had made the statement that he wasn't going to cooperate and testify, what happened then? Did the court talk to Pabon, or how did it come that he made this statement and then he winds up testifying anyway? What happens? The impression that I get is that the prosecutors brought this up to the court so they could get help convincing Pabon to testify. So did the court help? As far as I can see from the transcript, the court never had to instruct Pabon because Pabon's lawyer went and talked to him and he turned around and said, okay, I'll testify. Judge Lopez, do you have any questions? Yes, I do. Thank you. With respect to this disclosure about the statement that Pabon Colon made about his being prepared for trial, about his plan to not cooperate, it's my understanding that although the disclosure of that comment came late in the trial, the trial was still ongoing. Am I correct that the court indicated that it would permit the defense to recall Pabon Colon if they wished? In other words, before the trial ended, the judge did give defense counsel an opportunity to deal with this late disclosure and defense counsel chose not to accept the invitation to reopen for that purpose. Is that true? Did that happen in that way? It did not. It did not happen at all, Your Honor. This report never offered the defense the right to recall Pabon based on the ex parte communications which were held to release giglio material to the court. That did not happen, Your Honor. It's not on this record. Did the defense request permission to recall? What happens is that they didn't find out after the trial. The trial lawyers did not find out about this disclosure after the trial. Why is that? They had the transcript that included the disclosure before the trial ended, correct? They received the transcript on September 24th. The trial had not ended. But here's the little catch here. You normally, as a defense lawyer, don't look to see if ex parte communications are revealed in a transcript. You don't. That doesn't happen. It didn't happen in this case. And when did Pabon— So counsel—excuse me. Go ahead. Sorry. Thank you. So when the trial judge says in his ruling on this issue, I mean, he makes the point that the defendants could have recalled Pabon Cologne to the stand later in the trial. He's not indicating—he doesn't say that he offered them that opportunity. His point simply is that is something they could have done. They could have requested that. But it's your understanding that he never actually offered them that opportunity during the course of the trial. Is that correct? That is correct, Your Honor. The record doesn't reflect that. And when the judge says that, he's simply adopting the government's catch-me-if-you-kind kind of argument. I did something to violate Giglio, but it was on the record, and you should have caught me. And we believe that's not proper. All right. Thank you. Thank you. At this time, would Attorney Lazarovar please introduce herself on the record to begin? May I please start? Good morning, judges. My name is Liza Rivar, and I am a counsel for Aurea Vasquez-Rijos. And before I start, I would like to save two minutes for rebuttal, if that is possible, judges. Okay. Okay. Now, judges, in this case, the gift of Aurea's defense was the mental state of Alex Pabon-Colomb. And as you have heard, we did have the MDC medical records for him. I did have them, Judge. The court gave them to me, and I went through them, and I knew what was there. Can I just understand what you say, they gave them to you? How did you get them? Did you subpoena them? The court ordered that I get them, and MDC complied with that order, and they were given to me. I came here to court, and I got them in a sealed box. Had you filed a subpoena or something for them? Yes, Judge, I had. You had a pending subpoena. Yes. And a motion. And that subpoena was to MDC? Yes. Yes. And I got them in a box with the order that once the case was over, to bring them back. And that is what I did. After trial, I put them back in the same box, and I brought them over to the court. So I did have those MDC files. Now, those files... Not to be taking much of your time, and I hope Judge Barron will accommodate me here. I don't quite understand. Why, if there's a court order, do you also have to pursue a subpoena for the records? Judge, I usually do everything just to be sure that I get them. So there was a subpoena, and there was a court order, and they did give them to me. And so is the reason that the other defendants didn't get it is because they didn't do belt and suspender? I don't know, Judge. I don't know the answer. What precipitated the court order? Was it the subpoena? The order of the court, I believe, specifically states to MDC to hand over all the records. What triggered the court to issue the order? What was it issuing the order? I filed for it, Your Honor. With the court? I filed a motion with the court because MDC subpoenas sometimes get lost in the track of the system. So I thought that I would be safer if I filed a motion, which I did, and the court granted the motion. I see. So I had both, a subpoena and the order of the court. The MDC records of Alex Pavoncourt. And that order said to make them available to all the defendants? You don't remember. I don't know the answer to that, but it's in black and white, Judge. Would anybody join your motion, or was it just a motion just on behalf of ARIA? Yes. It was just for ARIA. However, how the court phrased the order, I don't really, I can't answer that at this time, Your Honor. I would have to look that up. But there is a court order. Just one more. In the normal course of a criminal proceeding, the defendant files a discovery motion, and the government is expected to respond to that discovery motion, which in essence asks for everything. I mean, was a discovery motion filed here by everybody? Or do you remember? Not by me, that I can't tell right now, Judge. I mean, if I file also a discovery motion as to it. Okay. We'll check the record. Now, those records showed that from time to time he had issues, and that right three months before trial, he had asked that he should be tested, evaluated, because he had to show that he was not crazy. Right after his asking for that, Judge, there's an entry in those records stating that he is well, that he doesn't have any mental issues at all, and that he is now a care one, which means he doesn't need to be seen by health professionals. So with those records, I go to trial. And during cross-examination, I was sort of held back by the court and government, not to ask what was his mental condition, diagnosis. I was able to ask about whatever he took, medicines he took, but not about a mental condition specifically. The government argued during that time, during my cross, that he was well mentally and he had no issues, which was the last entry in the entry. Excuse me, if I might just ask a question, please, without getting into specifics. It's my understanding that when questions were asked about the purpose for which certain medications were being taken, that was explained to the jury. The jury was specifically told about the link between the medication and the mental condition for which it was being taken. I don't want you to identify the condition, but is that a correct statement, that that linkage was made between the medication and the mental condition which it was being taken for? Is that correct? Yes, Josh, that is true. At the end of the case, it was stated that what he took was used for certain medical state conditions. However, during trial, I was unable to bring out conditions that were, how would I say, that were specific. After trial- You mean specific to him? I'm sorry? You mean specific to him? Yes, specific to him, Judge. After trial, there were contacts from this man, co-defendant, to counsel. That was placed on the case file, and we were then asking the court to give us more records. Whenever there was a contact by him to counsel, counsel for him, Mr. Aguayo, raised the issue of mental competency. And then he was rushed off, and we were never able to either speak to him or see him, which is what he was asking for. He did state that he wanted to speak to defense counsel, and in fact, at a point in time, stated that he was asking for a new trial for all of us. One of those letters are filed in the case file. So when he is taken out of the island and comes back, and we have evaluations, we eventually have three of them, which were completely different from the MDC records that I have seen. Being so- I'm sorry? What do you mean? You mean as far as the diagnosis? Diagnosis, testing, he had never been tested at MDC, Judge. Finally, he was tested, and he was given a new mental condition, and stated that the one that had been in the MDC record was completely incorrect. That issue had never been put there. So at that time, I asked for a new trial, because I had been under the impression that he had A, when he never had A, he had B. And that also mattered, Judge, because- This is post-verdict? Yes, post-verdict. And then just on this, the appeal from that post-verdict motion- Correct. This is the September 21st order? Yes. There's no appeal taken from that within 14 days, correct? Correct, Your Honor. Okay, so if the government's right that there had to be an appeal, then we're barred from considering that. I understand you make the argument that there isn't. But putting that aside for the moment, was that same motion then made subsequently, and was there then a timely appeal from the denial of the subsequent motion? Yes. And what's the date for that? Do you remember what the- I can look that up, Judge. And as I understand it, the government's contention with respect to that second motion, is that second motion identical to the first motion? Most of it, Judge. Okay. They just are the same. And what's your answer? The government says that's law of the case, and that's why it's barred. How are we supposed to think about if we- and I know you challenge this- but just if we assume for the moment that when there's a denial of a Rule 33 motion after an appeal from the conviction has been taken, so there's a pending appeal, district court cannot grant relief on it. The most they could do is give an indicative ruling in favor of it. But when they actually deny it, if it's the case that you do have to appeal the denial separately, and I know you challenge that, but assuming that's true, how are we supposed to think about a subsequent identical motion from which an appeal is taken? Because it does seem to then just evade the time limit for making a timely appeal if you can just say, oh, yeah, it's true, I didn't make a timely appeal, but I just refiled it, and now I made a timely appeal. So what's the answer to that? Yes, Judge. In that case, Judge, what has happened was that even though our motions to the court, you can think of them as being identical, the fact as to each of those motions changed completely from day to night because they have to do with testing, they have to do with mental condition of this man. And it did change, Your Honor, it did change completely from day to night. I mean, I had a case that was turned around, and I could have made a cross-examination, Judge, if I had known what was done finally with him. So on your thought is that there's a new Rule 33, we just look at it as a new one, that was timely appeal, so that's the motion that's before us, the denial of that motion then, insofar as you had to file a 14-day appeal. It's the last motion from which there was a timely appeal is the motion that we should be looking at to then evaluate the Rule 33. I'm sorry, Judge. Could you just briefly indicate, you said it changed night to day from the first one to the second one. What changed between the first 33 and the second 33? Diagnosis, testing, completely, Judge. He had never been tested while he was at MDC. In fact, there were months and years in which no one saw him. No one saw him. When he is off MDC, he was completely tested, Judge, completely tested. And it's there in black and white what he had since when he had it. But the problem that I'm seeing in this, just to help me get your answer on this, I'm tracking what you're saying about why that second Rule 33 motion might not be subject to an appellate jurisdictional bar because there was a timely appeal of it. But the ground for the new testing and new evaluation of the person that you're seeking in that one, from what you're saying, would seem to have been just as apparent at the time of the earlier Rule 33 motion. And the concern, then, is that doesn't that make the second Rule 33 motion fail because at the time you're bringing it, you had an earlier recourse in the earlier Rule 33 motion that wasn't taken advantage of or to the extent it was taken advantage of, you forfeited because you didn't do the appeal. What's the answer to that? Well, Judge, the first motion that was filed only had part of what we now know of what has happened with this man. It was a very, very small part. And we have to also know, Judge, that the court had made an order that when he pled guilty, he was competent. And that was an issue before the court and after with the trial jury. However, when the first MVC records were seen by me, I had no basis, Judge, to ask for anything else. The first basis to inquire as to his mental health condition came with the first evaluation in 2019 and what was done there. And after that, there were two more, subsequent more, which went deeper into his mental health condition, went as far as when he was a teenager from the records of the court. I never had that. Does the panel have any final questions? Yes, thank you. Two questions. We've established that at trial, Yvonne Colon was cross-examined extensively about his mental health condition on the basis of the records that were then available to the defense. These post-verdict efforts to get more up-to-date information about his mental health condition would be for the same purpose, would be to impeach him, to try to impair his credibility. I mean, the government makes this point at length. As a matter of black-letter law, in order to get a new trial on the basis of newly discovered evidence, and nobody questions the proposition that this post-trial evidence of his mental condition is new evidence. You have to establish its materiality. And virtually, by definition, if it's solely for the purpose of impeachment, it is not considered material. So how do you get around that sort of black-letter law, which all you're trying to do here is to get further material that you could use for impeachment to supplement what you already did at trial? How do you get around that? George, the law of the case can change. It can change if it was made with records that were inaccurate. It can change if there is manifest injustice. It can change with new evidence. And that is what I believe should be held here, that the law of the case is not to apply here. First of all, the MDC records were a disaster. I can't say it any other way. They have no basis in medical science at all. The records that come after are records that are based in testing, medical records, observations, diagnosis. That never happened. How I was during trial, I was held back of asking questions about his medical condition. So it's not only the fact that I could use them against Pablo Colón impeachment, it is the fact that this was not a fair trial for him, for my client. I could have made more if we had known what we knew. And why didn't we know? Because the court at all times refused a medical examination going back to the date of when events happened. It was always a present-day evaluation. And I think that the law of the case should not be upheld as to the facts of this case, George. Judge Lopez, you had a second question? Yes, thank you. Frankly, counsel, I'm a little surprised that neither you nor your co-counsel has mentioned the decision of the trial judge to take judicial notice of entry of the cooperating witness's plea, and in conjunction with that, the determination by the judge that he was found competent to enter such a plea, and the decision of the judge, I gather at the request of the state, that the judge actually tell the jury that he made that competency determination. Now, perhaps one of the co-counsel has not argued yet, and perhaps he'll address that. But I would like to understand. I know you all addressed that issue. I'd like to understand how you argue that issue. Are you arguing that that was another indication of judicial bias on the part of the judge, the fact that he did that? Are you arguing that it was a—I guess to give you one other option, are you arguing that it was an error because the judge was, in effect, telling the jury his view on the credibility of the witness, and that that was unfair in some due process sense? How are you arguing that decision of the judge? In what way was it error in your view? Please go ahead. Judge, to me, it was an error from the court because of the way events happened. On the day of the change of plea, Pabon Colon had been at MDC for some months. And by that time, there had been an entry in those records of some issues he had. And those issues, he mentions them to the court. And he mentions to the court that he is taking some pills, but he didn't take them that day because he knew he was coming to court. And the court simply went over it very lightly. The court didn't go in depth as to it. He then pleads guilty. During trial, the judge then indicated that he would take judicial notice that at that time, on that day, he was competent. I, at that time- I'm sorry, before you get to the ultimate answer to Judge Lopez's question, could you go into a little bit more detail about what happened when he took the plea? You said he went over it lightly. Was there inquiry made of his attorney at that point as to whether he had shown any signs of competency, or what do you mean by he went over it lightly? Okay. It was a very short change of plea. The motion was filed one day. The next day, they saw it. And counsel for him at that time said that, as to him, he was competent. And he is the same counsel who, months and years afterwards, starts saying he is not competent. So, at that time, when the judge advised me that he was going to take notice that he was competent when he pled guilty, I opposed it because of the following reasons. There was no basis to say that, not even from the MDC record. Not even from the change of plea record. He had barely made a few questions. Pabon Colon gave a few answers. Pabon Colon, he wasn't even questioned. The only thing- Counsel, excuse me, this seems like a very strange argument. It sounds like you're challenging the decision of the judge at the time to make a competency determination. What does that have to do with anything that we're talking about here? Okay, Judge. Is that what you're arguing? That you think the judge should not have made a competency determination at the time that the plea was entered? Is that your argument? Yes, Judge. He had to do it. However, taking notice for the jury that that was what was done, that swept under the rug anything that I was doing as to defense work, as to my client. He could have been competent when he pled. It doesn't mean he didn't have a mental condition. Those are two things, at least to me, I may be wrong, that are different. But the questions that were made on that day were, is he counsel? Is he, well, is he competent? Yes, he is, Judge. Okay, that's fine. I don't argue that the court did wrong there. What I am saying is, when he pleaded, he was going to give notice to the jury. To me, that takes away from the jury the ultimate fact, decision of whether Pavon Colon was in his right mind or not, or if he suffered from any other condition. Anything further, Judge Lopez? No, thank you. Judge Thompson. I thought you were making like a two-pronged competency attack, one more substantive and one more going towards impeachment. In other words, I thought your questioning was going towards his mental disability was so severe that he was delusional, and thus the result of those, at least at some point, the letters that were being written to other people, and the other was that his incompetency was such that he shouldn't be believed. In other words, going to his credibility. Judge, if I can ask the court, can I be more in detail as to what is? I don't think you need to. It's been very hard to try to go. We have all of your briefing in the field forum. We do. And if we need to ask you more detail, we can certainly do it in a closed session if the judges are letting me. Very well. Thank you. Did you want to? I don't think you responded to Judge Thompson. Can you respond with that? I thought that was your question, Judge. Yes, I'd like to hear it. Sure. Okay. New evidence can be new evidence, and it has to do with due process, a fair trial, and it can also be used for impeachment. So in this case specific, it is so overwhelming. And due to the fact that the court stated to the jury that this man was competent when he pled guilty, those factors, when they are together, to me they raise a due process issue. Thank you. Thank you, counsel. At this time, if Attorney Omo would please introduce himself on the record. Good morning, Honorable Judge Thompson, Honorable Judge Barron, and Honorable Judge Lippes. May I begin? Yes. First of all, there was no extensive cross-examination of Pabon's mental condition. When Ms. Lizarriver attempted to do so, she was stopped, and parties approached the bench. Prosecutors stated, Judge, there's only a limited evidence in the medical records that they have and we have, but he's okay mentally. She didn't mention at that time, nor any of the lawyers knew, about three pre-trial diagnostics that were very relevant to that assertion made by the prosecution. Obviously, those three diagnostics were not known by the defense. Now, just so I can understand, you say three pre-trial diagnoses? Yes. So those are diagnoses that occurred pre-trial? Yes, of a certain condition. And those were not in the MDC records, or they were in the MDC records? They were in the MDC records provided post-trial. Well, were they provided to ARIA during trial? I understand. I'm not asking. I know that your client is not ARIA, but were they provided to ARIA during the trial? I don't know what was provided to ARIA during the trial, but the record shows by the assertion of the prosecution to the judge with all the lawyers, there's only a limited evidence, but he's okay according to the records. That contradicts what we find out later of three. I know, but what we're trying to figure out is for the Rule 33 motion that you're bringing, there is a contention that records were never given to you and you couldn't have possibly gotten them until later. The diagnoses that you're talking about, I take it, are in the MDC records that are encompassed by the district court order during trial or pre-trial, requiring those records to have been made available, correct? They should have been, but my position is different than Ms. Arriba's. Aria's position is different. It's not saying he didn't get any records. He got some records. They knew he was taking Risperdal. That's why they were asked and everybody, but they didn't know about those three particular diagnoses of a particular mental condition that was very relevant. Right, but what we're trying to figure out is why didn't you know that, and is that because we're trying to understand how it is that there's a district court order requiring the records to be turned over. One party got the records. The other two parties did not get the records until later, and we're trying to figure out who's responsible for them not having been obtained, which is a relevant question under Rule 33 because one of the things we ask under Rule 33 is, could you have gotten it earlier? And you need to make a showing that, no, you couldn't have. You did what you're supposed to do. You were diligent. You tried to get them and you couldn't get them. So just saying that you didn't get them doesn't help me answer the question of why didn't you get them. When some defendant did get them and when there was a court order seemingly saying they should be provided. So can you help me with that? Yes, Ferrer did get medical records, but in those medical records those three diagnoses were not there. They were extracted. They were only provided after trial when his mental issue came about. So you got redacted medical records? Apparently, Your Honor, apparently. How did you get yours? Did you go with the envelope in the courthouse way, or how did you get yours? I was no trial attorney. How did a trial attorney get the records? I don't know how he got them. I know that he got them, that they did not include the three diagnostics, but that it included certain material, which was what Ms. Rita Rivera asked about hallucinations, about taking a respirator down. But the thing is, for the Rule 33 motion, you have to make a showing that despite your efforts, you were denied something. Correct? Yes, but we were not denied. We were just handed partial records that did not have those three, so we didn't know. The attorneys were under the impression that they got the medical records. They had no reason to doubt what the prosecution did until post-trial, that for other reasons. All of a sudden, then you see news that you guys didn't get. Then they pop up, you know. So obviously, if those. . . over the seeming obstacle on materiality, which is that the use of the records would be made to make the case that there was a, that you could impeach the witness, and then the argument is, but how is that going to be enough, given our case law? Well, the theory of the defense for Ferrer was the same as Aures and Marcia, that crazy honest was, in fact, crazy, basically. Unless I'm missing something. That's an argument that you were going to use it to impeach. Yes. And Judge López is asking, as your counsel for you as a defendant, how can that be enough under Rule 33 when we've got case law saying that if it's solely for impeachment, it doesn't meet that materiality requirement? Yes, Your Honor. It goes to the substance of his testimony, how he said that things happen don't make much sense. In fact, his testimony doesn't even have a time frame. It's all leading questions, and the judge is helping all the time. He basically doesn't even have a time frame. It all happens in one day. They go have lunch. They ask for three meals for four people, you know. Then they, all of a sudden, decide to kill the husband of some of the other people eating at the table. And at night, he goes and he meets Ferrer, and Ferrer tells him, that's the guy you have to kill. And then he grabs a cobblestone and he enters a restaurant and takes a knife, and he goes and he kills him. That's the testimony. It was, the judge had to tell Fabon on five times to be responsive. He was. I guess I'm just not hearing an answer to my question. Are you saying that you were using it for impeachment or not for impeachment? I'm saying that it served both purposes. What's the second purpose? I haven't heard the second one. To sustain our theory that he was making up a story. That's an impeachment argument, isn't it? Well, that was also the theory of the defense. Right. So what is, do you have a legal answer to Judge Lopez's question about whether at a Rule 33 stage you're able to put forward evidence? Well, I'm sorry. I didn't think that it was an impeachment argument. I thought you were saying that substantively, because of his condition, that he was delusional. Yes. So the whole thing is just unreliable? Yes. I mean, I thought you were making impeachment and substantive. I think it can work both ways, Your Honor. Yes. But it's more to the substance because it goes to our theory that he's making it up. And also his testimony is so scant and insufficient that the prosecution, at every argument, they say, oh, Harmer's error because overwhelming evidence. Well, no. There is no Harmer's error in any of our arguments because there was no overwhelming evidence. Excuse me, counsel. Let me just say, as you explain yourself, it sounds like you're really trying to argue that he was, because he was delusional, out of touch with reality, that he was incompetent to testify. But that's not the law. I mean, there's no such thing as, to my knowledge, that a witness is incompetent to testify. To the extent there are competency issues, that goes back to credibility, doesn't it? Yes, Your Honor, and I'm not arguing that. I'm arguing that when Pabon Colon is asked if he had to take medicines, he said, no, I don't even take the medicines. I sell them. He denied ever having any mental issue, which was our theory of defense. And this evidence sustained our theory of defense. The pretrial diagnostics really support our theory of defense. If we had had those diagnostics, we could have questioned him, and we could have placed into context how a person, under those conditions, analyzes the things around him. And the jury could have understood better our theory of defense, that it wasn't possible that this happened, that he had to make it up. But what we have really here is bolstering of not only the only witness to the conspiracy, because there is no corroboration to him, that he told Osterman what happened or that he told anybody else what happened. Nobody else was in the plan to conspire. Can I just ask you the same set of questions I was asking about, whether we can reach the Rule 33 issue that you're raising? So there was a September 21st denial. There's no timely appeal taken from that denial, correct? Your Honor, when we appeal the case, we include the new trial based on the limits that the judge imposed on his cross-examination about his mental capacity, on the limits that the judge imposed on our presentation of our defense theory. All right, but the new evidence that you're talking about, that you first discovered post-trial, about the diagnoses that occurred pre-trial that you didn't know about, that first time that's referenced is in the Rule 33 motion, correct? Yes, Your Honor. Okay, that's denied on September 21st, and there's no appeal taken from it within 14 days, correct? Correct, Your Honor. Okay, then there's another new trial motion, Rule 33 motion, filed by your client? Yes. And is there – how many of those are there beyond the September 21st? I believe there are two or three sets of those motions that were presented. Post-September 21st? I'm not sure, Your Honor, about the date. Okay. And in one of those, there was an appeal within 14 days from it? Yes, Your Honor, but our position as to that is that we asked permission to the district court – I mean, to the honorable court, and we presented those matters to the honorable court, and we were instructed to go and ask for indicative ruling and then come back and notify, okay? And that's what we did. And there was an order by the court then telling us, okay, then just place all of your arguments in the opening brief. So I believe that the – At that point, you couldn't cure the 14 days? There was nothing saying – were you told not to file an appeal? Our position is that the rule just says – It doesn't say – I know that. It doesn't say appeal. I'm trying to figure out what we're supposed to do if we disagree with you. Yes, I know you're – and I – seriously, I read the rule, both rules, like 20 times, and I was confused, and I'm still confused. Thank you, counsel, at this time. Okay, great. We're going to just take a quick break, and then we'll hear from the government. All rise. Court is going to take a brief recess. Please remember that the microphones are live in the courtroom. Thank you. Thank you. Thank you. Thank you. We're going to start in a minute. We're going to start in a minute. We're going to start in a minute. We're going to start in a minute. All right. All right. Court is in session. We're going to recommence argument for 19-1305 and others. At this time, would Attorney Sophia Vickery please introduce herself on the record to begin? May it please the Court, Sophia Vickery for the United States. I thought I might just pick up where we had left off with respect to the timeliness of the defendants' appeals. So about a year after trial, the defendants filed a series of motions seeking an array of relief, the Rule 33 relief, the psychiatric exams of Mr. Pabon-Colón, post-conviction discovery, and an evidentiary hearing. The district court denied all of those motions in a comprehensive indicative ruling. It's a February 21, 2020, ruling. The defendants did not file a timely appeal within 14 days. That would have been by March 6. No notices of appeal were filed. That's a mandatory rule when properly invoked by the government. The government has invoked it in its opening brief, and it's mandatory on this Court. That's made clear in a series of Supreme Court cases. Before you get to the case law on that point, the defendants came to this Court at some point in reference to what to do about the Rule 33 motions, correct? Yes, there was a motion filed with this Court to stay the proceedings and to remand back to the district court. And that was done prior to the February 21 ruling? Correct, that was prior to and before the time that they filed their motions for the indicative ruling. So this Court denied their request for a remand without prejudice to following the procedures for the indicative ruling. It was after that order that the defendants filed the motions for the indicative ruling. Okay, and then they made reference to an order from this Court saying, put everything in your opening brief. So there were a series of other motions filed much later in time. So as late, I think, as the summer of maybe 2021, so after the indicative ruling, asking this Court to order a psychiatric exam of Mr. Pabon-Colón, and sort of remaking the indicative ruling arguments directly to this Court. This Court denied those motions and asked them to put their arguments. So from the government's position, there's nothing in any order of this Court that suggested that there was any reason to think, whatever the rules are for whether you have to appeal within 14 days from a denial of a Rule 33 motion made after appeal has been filed in the criminal case. Nothing we said suggests you don't have to comply with those rules. That's your position. Correct. And just for completeness, OREA did file a status report with this Court, which had been ordered to do while the appeal was stayed. There is one that is within the 14 days. I believe it's March 3rd. But that status report should not be construed as a notice of appeal. She asked for additional time, says that they are still figuring out what to do. So your position is there was not only not an initial notice of appeal, but then no subsequent notice of appeal from any subsequent order? No, I'm sorry. I just meant within the 14 days. I got it. Okay. Right. There are those subsequent notices of appeal, which I can address. If we ordered her to file status reports, what does that do to any timeliness or any time limitation? No, nothing, Your Honor. I just mentioned that she did actually file something. Was that at our request? Yes. I believe this Court had asked for status reports every 30 days just while the appeal was stayed on what was happening, I guess, in the district court litigation. And so there was one status report that happened to fall within the 14 days. I just wanted to mention that because it is on the docket within the 14 days, but it is not a notice of appeal. But the status reports were with respect to the stay of the appeal pending, not, as you understand it, any indication about what's supposed to happen with respect to any appeals that might be required of denials of Rule 33 motion that was filed below. Yes, Your Honor. Okay. Let's bracket for a second whether a denial of the Rule 33 motion has to be appealed within 14 days. And let's assume it does. So it didn't happen. There's then subsequent Rule 33 motions from which a timely appeal was made and the government conceived that so, correct? There were not subsequent Rule 33 motions, Your Honor. There are a series of additional motions, but they are much more narrow. So, first of all, they're only asked to two defendants. Their notices of appeal are only filed by two defendants, Araya and Marcia. Mr. Ferrer-Sosa has no notice of appeal after the original notice. He did have one, but it was dismissed by the court as untimely. And then the motions that underlie those district court orders are also very narrow. They are with respect to post-conviction discovery and the psychiatric examination of Mr. Pabon-Colón only. The Rule 33 motion is not made again. Okay. The government makes an argument that with respect to those subsequent motions, from the denial of which a timely appeal was made according even to the government, that somehow law of the case precludes consideration of the appeals of those denials. That's what your brief says. Am I misreading your brief? No, Your Honor. That's right. And I'm having trouble understanding what law of the case would have to do with it. It would seem like, even on your own account, those subsequent motions, which are different, as you just described it, from the earlier denial, just are their own new case, in effect, from which there is then a new appeal. And we just look at those on their own terms. So they were a subset of their relief. So they're not new because that kind of relief was also requested for the initial indicative ruling. The defendants had also requested the psychiatric exam and the post-conviction discovery. So the government's position is that those notices would be timely on the very narrow ground as to whether the district court properly applied law of the case in rejecting those motions on the basis of the original indicative ruling. That's what I'm trying to say. Does law of the case apply to that? Yes, Your Honor. To the new motion? There's no authority cited for that in your briefing. Because what you cite are cases involving subsequent Rule 33 motions. So the law of the case applies because the defendants could have appealed the indicative ruling, which decided those issues, in addition to the Rule 33 motion. But law of the case is when it's the same case. And I guess I'm trying to figure out when there's a new Rule 33 motion, is that the same case as the old 33 motion? Do we think of it as the case is the pending criminal case? But there's no case law that you've cited that tells me how to fake threat through. So I think the case is the entire criminal case. Do you have something that supports that position? So, for example, some of the cases we cited describe post-conviction proceedings and explain that when a defendant doesn't appeal an earlier ruling. Yeah, but those are in the appeal process of the same case. They're not Rule 33 motions from which subsequent appeals have to be taken. None of those cases are. They're all petition for rehearing type situations. You're talking about something different, which is that there's a new notice of appeal required from the Rule 33 motion. Right, and because it was unappealed. I understand that. But then for law of the case, I don't see that there's any authority cited to support the idea that that extends over. You mean within the district court? Correct. I think this court is not bound by the fact that the district court ruled on the issue, but rather that the defendant didn't appeal the district court's ruling on that issue. And the post-conviction discovery motion, for example, and the psychiatric exam motion, which were the subsequent motions. So, again, there's not a subsequent Rule 33 motion. It's just those other aspects of the relief. The district court had already addressed those on the merits, and for the same reasons that it was designed in the indicative ruling. And this is clear from looking at the text of those district court orders. The district court says, I'm, again, denying this. I already denied it. The same rationale applies to this denial as well. But if there was a timely appeal from that, then we can review that. I think you could review the applyal of whether it was correct for the district court to apply the indicative ruling to those new motions. Yes, that narrow subset with respect to two of the defendants and two of the grounds for relief. And what does that include in the government's view? That's properly before us, even on your view, then. Just the post-conviction discovery and the psychiatric exam, because those were the only motions that were filed. There's a series of them. In May was the post-conviction discovery. In September was the psychiatric exam. And so what wouldn't be available to us would be the issues about the exclusion or the supposed non-provision of the pretrial diagnosis that are claimed not to have been given over? Correct, so the Rule 33 argument. And it's also not available to Mr. Ferrer-Sosa because he did not file subsequently. But the question of whether he could have been examined, should have been ordered for a new exam, that would be before us? With respect to two of the defendants, on the narrow ground as to whether the district court properly denied it on the basis of its prior indicative ruling, yes. And what's your answer as to whether it did? It did properly. Because what? And I can go to the merits as well. So with respect to the psychiatric examination, there's no authority for a court to order a non-party witness years after the trial to undergo a psychiatric exam to the extent it's relevant to competency. As I think has already been discussed, that would go to credibility. And the same types of arguments for post-conviction discovery, there's no defendants haven't identified what they would seek. They have records and haven't found a material issue that would justify a new trial. So those merits arguments would answer that. Can you just help us understand in terms of the material getting to ARIA but not to the other defendants? You've heard our questions about that. If I understand it from the last exchange, the MDC documents were handed over to two of the defendants in a form that did not include pre-trial diagnoses of the witness that were only then subsequently disclosed. Today is the first time I've heard about this sort of partial record redaction or redacted records argument. I had understood that ARIA was not disputing that the defense had the records, and there's an email in the record from the BOP to ARIA's counsel. The record supports the view that actually all of the defendants had. What about the other two? ARIA isn't here saying she didn't get it. It's the other two who are saying they either got it or only partially got it. Right. This is the first time I've heard the partially got argument. The record supports the view, though, that all of them had access to the records before and during trial. How is that? At trial, ARIA's counsel was the first to cross-examine Mr. Fuson-Colon and in detail went over his psychiatric symptoms, medications, including auditory hallucinations, other symptoms expressed. What is the process by which the other two would have gotten the records? The record is somewhat confused with respect to the subpoena issue. The district court found that ARIA's counsel was the only defendant to have served the subpoena on the BOP. Did that come first, the court order or the subpoena? I don't even know why there was a need for a subpoena if there was a court order. Right. So the court order, there was pretrial litigation over whether these records were even relevant in the first instance, and the government opposed production of them in discovery in part to protect the medical records of a government witness. The defendants prevailed on that argument, and so the district court's order, which is in the joint supplemental appendix at 168. So there was a discovery motion from all of the defendants for the records in question that the government was then opposing, and that precipitated the order? There was a subpoena for the records, and the government moved to quash the subpoena, which is what precipitated this order. And that was from all three defendants or just ARIA? I had understood it was a subpoena only from ARIA. I'm not certain who was in that motion. I don't have it in front of me. Anyway, did the court's order go to all three defendants? Yes. All right. So the court ordered that all three defendants be able to get the discovery requested. So what happened? So the order said entitled to the medical records. After that order, there are some additional entries on the district court docket where Marcia asked for the subpoena to reissue, said she didn't have access. It was reissued. There's no indication that it was ever then served. ARIA got the records. There was lots of talk at trial about the records from all counsel. I don't understand why there's a court order. Why doesn't the government's attorney contact the prison to say, we need the records, turn them over to us so we can turn them over to the defendants? That's not in the record. I would say that no one told the district court at any time we don't have the records or there's an order that hasn't been complied with. I suppose the government assumed the defendants had the records since they were talking about them, asking questions about them, and everyone seemed aware of their content at trial. There's statements in the trial transcript like, here is the package of records and let me show you a date with respect to this medication in my records. The prosecutor talks about the records the defendants have. I suppose the government assumed that they had them or that their collective defense was sharing them. So the extensive cross-examination covered the material in the records to a great extent. The district court explained that the jury was, quote, well-informed of Mr. Coppola and his history with this particular diagnosis. The district court even took judicial notice that risked So knowing that at least two of the defendants are alleging that they didn't get the records, that doesn't impact your argument? So it doesn't if they either didn't exercise any diligence to get them or tell anyone that they didn't have them Or if they actually did have them. If there's a court order that says you're supposed to get them, how are you supposed to know what you don't know? Particularly if the government's attorney doesn't assume responsibility for making sure that a court order is complied with. As I understand Marcia's argument, Marcia's counsel's argument, that he didn't have any records at all. And so presumably he knows that there are records and can tell someone that he didn't have them. I'm not sure that there's any evidence on the record that Mr. Ferrer shows us, the record that he's now saying today he actually did have were partial or redacted versus perhaps he didn't see those aspects when he was reviewing the records that he now sees and would like to cross-examine about. I'm not sure. So no one told the district court after the litigation? Is there anything in the showing in the Rule 33 motion by the move-in that explains what they didn't get when? My question is what does the Rule 33 motion say with respect to why they didn't have it before? It doesn't say. My recollection of that motion is it just says we didn't have it. The government didn't. I'm sorry. It doesn't actually say we didn't have it. It says the government didn't produce them. Well, that sounds true. I think it's also true that they didn't tell anyone that they didn't have them or alert the government as to any issues. So I don't know whether or not they actually had them. How should we presume that the defense attorneys are cooperating with one another on that level? I'm not assuming it, Your Honor. I'm suggesting that the rule 33 motion says the government didn't produce it. That's why we didn't have it. What does it matter that the government assumed at trial that they did have it? So the Rule 33 motion, as I read it, just says the government didn't produce it. It doesn't say we didn't have it. It doesn't say they had it. I'm sorry. It also doesn't say they had it. Right. It doesn't say one way or the other. What I'm suggesting is that the trial transcript makes clear that everyone was familiar with the records. Well, it doesn't make clear that they were familiar with the aspects of the record that they didn't talk about. Right, but that they – Well, then how do we know that they had those aspects of the record? So they have – the trial transcript talks about the package of records. I guess there's no way on what we have today to go and confirm that there's – Well, in the Rule 33 motion, they identify certain things that they are basing their claim on that weren't produced, correct? They're identifying the package of records, and the district court found that in that package of records, that included all the diagnoses, the symptoms, these other aspects of theirs. And you're saying there's nothing in the Rule 33 motion that's at odds with that finding by the district court? Yes. I don't quite understand. They're saying they didn't get the package. Two of them are saying they didn't get the package until later. I think maybe only one now. Mr. Furst, as I understand it, is now saying he had parts of the package. Yeah, but we don't know what parts. He didn't tell us what parts he had. All we know is that there's a court order that says the government is supposed to produce these records, and the government seems to abscond any responsibility for personally doing so. And we also know that the defendants were very familiar with the contents of the records, knew that the records existed since it had been the subject of extensive pre-trial litigation, and didn't tell anyone. They didn't know what they didn't know, did they? Well, to the extent they're saying they received no records at all, they knew that they were entitled to the records. Obviously this was very much at the top of their minds in this pre-trial litigation with the subpoena. They never told the district court, no, someone is not complying with your order before trial or during. But just with respect to the ruling by the district court on this question, the district court's ruling includes the determination that they had access to the records, and your contention is that the record adequately supports that conclusion by the district court, given what was said about the records at the trial, correct? Yes. And your contention is they haven't shown anything that shows clear error on the district court's part in that regard, I guess. And then secondly, with respect to this question of did what they have include these three pre-trial diagnoses, the contention is that that wasn't made, that contention was not made in the Rule 33 motion, so they can't now raise it, is that the idea? I think that's part of it, and there's also nothing in the record to support that fact. The district court found that the package, which is about 500 pages, contained all of that information, and there's nothing to suggest to support the idea that someone over- Your contention is the time to make the record to show that something was excluded and wasn't produced was before the district court in the Rule 33 motion, and we just look at that record and we see whether it supports the district court's conclusion to know you did get everything. Correct. Okay. In addition, there's no reasonable probability that any of this would have affected the trial result. As we've been talking about, it was extensively discussed at trial. The district court found the jury was informed of Mr. Capone's mental health history, his treatment, medications, symptoms. As I was saying, the district court even took judicial notice about Risperdal, which is a prescription medication prescribed and the purpose for which it was prescribed. And the jury chose to believe Mr. Capone's testimony, and there was also extensive corroboration and other evidence supporting the defendant's conviction. I could- Counsel. Excuse me, counsel. A voice from beyond. Excuse me. Counsel, I'd like to shift ground a little bit to ask you about an issue that I alluded to with defense counsel, and that's the-at the request of the government, after Pabon is cross-examined extensively about his mental health history that we've been talking about, it appears that the government, somewhat concerned about the effectiveness of that cross-examination, asked the district court, on file as a motion, asked the district court to take judicial notice of the fact that he entered a plea of guilty before the court, and that the court took the plea, having found that the defendant was competent to enter that plea, and you, the government, asked the court to take judicial notice and tell the jury that it did that. So this is what the court grants that motion. And so the court took judicial notice. This is what the court tells the jury. On June 3, 2008, Alex Pabon Colon entered a plea of guilty in this case, and that during the plea and at the end of the hearing, the court found him competent and capable of entering an informed plea on the state. The court goes on to say that the final decision, whether or not to accept the facts, are for you, the jury, to make. You're not required to agree with the court. Now, this was done with a vociferous objection to defense counsel, making the point that, in effect, the court, by telling the jury that he had found the defendant competent, was really entering the debate over credibility. And the court seems to say things that support that in the sense that the court said, well, I'm just trying to balance the equities here. You've impeached the defendant at length. I think it's important for the jury to know that at this point in time, I found him competent. Why isn't defense counsel correct that the judge, in effect, was entering the debate on credibility and telling the jury that at least at this point in time, I found the defendant sufficiently competent to accept his plea? How is that an appropriate role for the court at all, to enter that critical debate over the credibility of the cooperating witness? Why isn't defense right that that was a basic error on the part of the judge? The judge simply should never have done that. How do you defend what the court did? So if I could just add something to the context that you described. Orrea's counsel had actually introduced the plea agreement as an exhibit. I believe it was Defense Exhibit R. And there were some questions about Mr. Pavone-Colón's mental health around the timeframe of that plea, which was in June of 2008. And so I believe that the concern was that there might be a suggestion that Mr. Pavone-Colón had not been competent to enter the guilty plea, or perhaps that the plea agreement was invalid. So that's the context. The wording of the judicial notice, which was done after discussion with counsel, was quite narrow. So it was only about competency, not credibility. I agree with Your Honor that if he had said that Mr. Pavone-Colón was credible, that would be an entirely different question. It was also limited to his competency in 2008 to enter the guilty plea. And then it was followed with jury instructions reminding the court that cooperator's testimony should be viewed with, quote, caution, that a cooperator might make up stories or exaggerate it, and that the guilty plea was not evidence of defendant's guilt, that the jury must find the facts on its own and that he didn't have to agree with judicial notice. So in that narrow context, it was not error for the court. It was not an abuse of discretion for the court to take that judicial notice. Counsel, what I'm trying to understand is you say that there is a distinction between competence and credibility. That's certainly true. But how could a jury, hearing that instruction, avoid the conclusion that at that point in time, when the plea was accepted, and in order to accept the plea, the judge had to find the defendant competent, that that is a suggestion that all of these attempts to challenge his credibility, that he's delusional, he's not trustworthy and so forth, the judge is saying, well, you, the jury, ought to know that I at least found him competent to enter a plea, that he was sufficiently rational, sufficiently reasonable, sufficiently in touch with reality that I decided to accept his plea. Why isn't that a statement by the judge that, well, there's another side of the story here? How could a jury not view the statement of the judge in exactly that way? Well, I think that might be an issue of potential confusion that would arise any time a guilty plea is entered into evidence, which is what Arraya's counsel did in this case. That tells a jury the defendant has pleaded guilty, and it also tells a jury that the guilty plea was accepted by a court, which a court can't do if the defendant is not competent. So the jury would have been, regardless of the judicial notice, and I guess in any case involving a guilty plea, the jury would have had an idea that the defendant was competent to enter that guilty plea. But the jury also was aware that Mr. Pozol and Colon was actually testifying at trial, so the jury also would be aware that he had been found, I suppose, competent to be a witness, to the extent that there is a competency determination for that. But none of those competency determinations. Well, there is no such thing as making a competency determination to be a witness. That doesn't exist. Right. I guess I'm saying that, you know, maybe he was able to understand reality such that who was the judge and who was the jury, et cetera. But I guess I'm saying competency is very narrow, and this judicial notice about his competency in 2008, so that's 10 years before trial, particularly in the context of all of the more recent mental health information that was available, that the defendants were asking him about, would not have had an adverse effect, would not have unfairly prejudiced the jury into believing Mr. Pozol and Colon's testimony. Counsel, when the court says to the jury, you are not required to agree with the court, what's the court talking about? You're not required to agree with the court in what sense? I had found him competent, but you could choose to disagree with me and find that he was incompetent? I mean, is the court setting up a scenario where, although I've said to you that he's competent, that's my view, you might take a different view? What is the court telling the jury when the court says that? I think that was the sort of general instruction given for all of the judicial notices, and I wouldn't say that the jury is free to find him incompetent, but I guess to the extent that this is a historical fact, like it is on the docket in 2008 that the district court found him competent. The district court was telling the jury that they're not required to agree with the judge's recitations of this historical fact along with the other historical facts, the other topics. The notice is not that he was competent. The notice was that he was found competent at that time. Yes, Your Honor. Thank you. Counsel, one further question on this. I mean, suppose we were to conclude that the judge erred in telling the jury that he had made that finding of competence. What would follow from that determination? If we were to decide that was an error, what analysis, in your view, should follow in the wake of such a conclusion? So it would need to be an error that rose to the level of an abuse of discretion. That's the standard for a judicial notice. And there would be a harmlessness analysis. I suppose this would kind of be like a Rule 403 analysis that the court would need to consider in the government's view whether this, I suppose the finding might be that it bolsters his credibility and consider that in the face of all of the other more recent evidence amidst a profound clone to mental health, that a jury would likely find to be more relevant given that it was closer in time to the trial and the jury's rejection of that impeachment evidence, the extensive corroborating evidence of Mr. Pabon's testimony, and the other evidence of the defendant's guilt to determine whether or not this error was harmless. Just to take the other two, to me, most salient questions about the judge intervening in a way that's alleged to have been biased in favor of the government's position. Could you just go through the two comments? The one about the question regarding the money and the second, the question about you must have been elated. To me, it matters what the words exactly are that the judge said. So let's start with the money one. Do you have handy? I have the money one. I don't know if I have the money one here. Yes, Your Honor. So there was a discussion, just to put it in context, there was a discussion about what Aurea might inherit from the business if Mr. Anhang died. The court said, let's see, there's an objection here. She has nothing. This is talking about the money from the business, an objection. Could you start a little bit before that? I'm sorry? Could you start a little bit before that? Sure. There's a series of objections here, so let me just get to the question. Sure. Okay. So the court is asking who has money in the business between Mr. Caucho, who is the business partner, and Mr. Anhang. So the questions from Aurea's counsel are to Caucho. So it was your money. It was my money, yes, very much so. Adam had no money invested in the businesses, correct? Correct. Yes, that is the truth. There's a question about their breakup, and then it continues here. The court says she had nothing, right? So he's talking about Aurea, whether Aurea had money invested in the business. The court said there's an objection. The court says I want his answer. You and I don't know the answer of how much money she had invested in the project. The witness, when I discussed with Adam, she had no money invested in any project, zero. The court, all right, so she has money if he dies. That's it? The witness only. That's the end of it. And now the thing that's concerning to me that I want you to address here is this. And so she has money if she dies. It's also the case that she has money if he doesn't die under the prenuptial, correct? I don't think from the business. So there was an alimony, correct? But that's the question there is that statement by the judge, it's not clear to me that it's clear to the jury at that point that that's an accurate statement of the evidence even. So I think in context, the money that they're talking about is whether Aurea has money invested in the business. And so whether she would get money from the – whether her money was invested in the business separate and apart from her marriage. And the question is, so she would only get money in the business if he dies. And I think the answer to that is yes, because that's – Right, but then what the judge says is, so she gets nothing. So he said that a couple questions before when he asked – Because at that point, the thing that the judge said needed to be identified was identified. The answer was given. Then the judge interjects and says, so she gets nothing. So I think Adam – well, the question was Adam had no money. And then the judge interjects and wanted to clarify, did Aurea herself have like personal investments in the business, I think? And so that's the question.  I suppose it's a little bit unclear because of the alimony provision, but I'm not certain that that would come from the business if he didn't die. I'm sorry, say that again. To the extent that there's confusion about whether she would get money if he didn't die, I think it might be because there was an alimony provision in the prenuptial agreement. But I don't think that that would be money from the business, which is what is being discussed in this line of questioning. And then the second part where the judge interjects is with the elated. And the concern is that that statement by the judge tends to bolster the truth of the letter. Right. And I don't have that page in front of me. I think the question was just, so you must have been elated when you received this letter. What's the point of asking that question? I think the judge is just recognizing sort of the dynamic in the courtroom and the obvious. Doesn't that suggest that his brother was innocent, that the defendants are guilty? I think it suggests at first that the brother was innocent, which nobody is disputing that Ramon was wrongfully convicted of a crime that he didn't do. And that, obviously, a letter suggesting someone else did it would be emotionally important. Yes, but it just happens that the person who suggested did it is the key witness in the case. And I don't think the defendants are disputing either that Mr. Poponcolon murdered Mr. Anhang. What they're disputing is their role in the conspiracy. And so it doesn't endorse the defendant's guilt that this letter was important to freeing someone wrongfully convicted for the crime. And it's also just a neutral statement to the brother of a wrongfully convicted person. The court also followed up with incurative instructions, saying that the jury shouldn't take anything from his questions, that it needed to decide the guilt or innocence of the defendants on its own. That wasn't a question. I'm sorry. Was that a question? I think it was, you must have been very elated, right? I think it was a suggestive question. I see that my – oh, that's the yellow light. Okay. The court has no further questions. I don't have it. Judge Lopez, do you? Yes, just very quickly. This goes back to the cooperating witness, what he said to the prosecution in a pretrial interview. He has the plan. He's not going to cooperate further. The prosecution recognizes the importance of that, at least to the extent that it has a sidebar conference with the judge about it, with Pavon Cologne's attorney present. But even acknowledging that – I don't understand the government to be taking the position that they probably should not – that the defense should probably not have been aware of what the cooperating witness said, but the government seems to rely on the fact that while a transcript was made of that, transcripts were made available to the defense, and we can rely on that. We had no independent obligation to disclose that kind of material. That seems to be a piece consistent with the argument that you made earlier. Well, the judge said that all of the defendants were entitled to these medical records, but we don't have to take any steps to implement that order. We'll rely on them to take whatever steps they have to deal with it. That seems to be the same attitude the government displays with respect to this statement by the cooperating witness. It's very troubling that the government is so passive about these obligations to disclose, and instead is saying, well, it's up to the defense to get this information. I mean, how do you justify the attitude with respect to this disclosure by the cooperating witness? How do you justify not taking an affirmative step to let the defendants know about that in a way in which they could effectively use that in cross-examination at trial, if they wish to? How do you justify that? Yes, Your Honor. I don't disagree. I think that the comment should have been disclosed in an abundance of caution. I think at the time that the conversation was happening, no one was thinking of the comment as potentially relevant to the witness's credibility. It was just a comment that he had pulled.  It wasn't the determination that the government was supposed to make. That's right, Your Honor. And that's why I think it should have been disclosed in an abundance of caution. The district court also didn't, I think, recognize in this ex parte meeting about the logistics of Mr. Poponcolon's attorney arriving on time that it might have that implication. But there was minimal, if any, relevance to the comment. It was not inconsistent with his testimony. It didn't say I'm going to recant or nothing that I have said before is true. It just said he had pulled feet about cooperating. I don't think it was relevant to his credibility either. It doesn't seem to be probative of his mental health. And to the extent that there was concern about incentives of a cooperator in a cooperation agreement, those topics were covered in impeachment and by the district court's instructions. So it doesn't rise to a reasonable probability standard as required for prejudice. But is there anything on the record that indicates that his retraction wouldn't have been a result of his mental health condition? I don't think it was a record. I'm sorry. I don't know. He made the statement. It was disclosed to the judge. I don't think the record tells us what happened after that. In other words, I guess at some point he changed his mind and decided to testify. But I don't think there's anything in the record that tells us what happens in between the disclosure to the court and then his ultimate testimony, is there? So my understanding, and I think maybe this was discussed in the motions before the district court, is that he briefly told the government in one of the preparation meetings, I'm not going to cooperate anymore, then consulted with his attorney, and then came back and told the government, never mind, yes, yes, I'm going to cooperate. So there's no recanting or retraction or changing of his testimony. It was sort of this brief period of time where he told the government he did not want to cooperate and then changed his mind again. Thank you. Thank you. Thank you, counsel. At this time, if Attorney Sanchez would introduce himself back on the record. He has a three-minute rebuttal. Carlos Sanchez on behalf of Audio Vasquez. I just want to point out about the judicial notice about the cooperator's competency. It was given twice, not once. It was given at the end of the government, when the government was about to rest its case, and this is at page 2307 of the appendix. And that in itself to bolster the government's case, because it's the court telling the jury that this guy in 2008 was competent. And it was devastating. How did that come up again? It came up again by way of judicial notice in the instructions. And this is at appendix 3329. So the judge gave that same instruction twice to this jury to emphasize, and that was extremely prejudicial in terms of the case that Marcia had, because Marcia, the only witness that the government brings to corroborate a conspiracy against Marcia, is Pavon. So Marcia at that point has no way, because it's at the end of the government's case, to try to impeach his credibility. And the judge is – Excuse me, counsel. Counsel, I need to understand something you just said. You said that as part of the judge's instruction to the jury at the end of the case, you say the judge repeated this judicial notice point to the jury as part of that closing instruction. Is that correct? Correct. That's a judicial notice. Now, the judge, in that instruction, there's always a general instruction to the jury about how they are to evaluate the credibility of the witness. That's standard. Are you saying that the judge, as part of giving that credibility instruction, repeated the fact that he had taken judicial notice of the competence of Pavon Colon? Is that what you're telling us? Yes, Your Honor. It's on page 3329 of the appendix. What section of the jury instruction is it in? Your Honor, it's in the section where he's giving the judicial notices, which are mostly, Your Honor, about Auria, have nothing to do with Marcia. And, Your Honor, I do want to come back to a question that Judge Lippest mentioned to co-counsel, Ms. Lisa River, where she was explaining that she was not permitted by the court to specifically use the term that this cooperator has, the medical health condition. She was not permitted. And Judge Lippest asked, there was a link between the medication and that condition, and at no time during the trial or during the cross-examination, may I continue, Your Honor? Yes, please. During the cross-examination of Pavon, was that specific term used? In fact, it is only used. It's buried in the instructions. When an instruction about the medication he's taken, Risperdal, at appendix 3330, it's mentioned, and it's diluted because that condition is mentioned, and it's mentioned with other conditions, including an autistic disorder. So at no point was that term that has been established, this guy has, was used during this trial. Thank you. Thank you. Thank you, counsel. At this time, Attorney Lazarovar, if you can please reintroduce yourself on the record. You have two minutes of rebuttal. May I please report? Lidia Alizar-River again. Judge, I would like to be able to clarify that the order of the court, I'm sorry, that the order of the court for the MDC was as to all counsel for defendants, and that is in our supplement appendix, which is sealed. And the MDC records are not part of this case record as such, apart. But I would urge the court to look at the forensic evaluation that was made, Judge, in June 2020. And pages 200 on, they make a mental health history about Alex Pavon Colon. And they are very, very detailed as to the MDC records. And that is the only thing I have that, you know. The letters of Alex Pavon Colon, Judge, are also, also important. Letters that he wrote after trial, which are part of the sealed documents we have, they are important because he is willing to speak to counsel. He is willing to testify, as he says, what he would say, I don't know. But he was willing to meet with us. And those are at least three letters. And he was silenced. He was silenced by the court. He was silenced by his counsel. And we were never allowed to reach Alex Pavon Colon. I'd like the court to know that. Thank you. Thank you, counsel. That concludes argument in this case. Counsel is excused. No, you didn't reserve any time. Thank you. That concludes argument in this case. Counsel for this case is excused. Dan, I think we're going to take another recess. Great. All rise.